Jill O. Gibson, OSB #973581
jgibson@lynchconger.com
Benjamin R. Becker, OSB #103358
bbecker@lynchconger.com
**LYNCH CONGER LLP**
15350 SW Sequoia Pkwy, Ste 250
Portland, Oregon 97224
Telephone: (541) 383-5857
Fax: (541) 383-3968

    Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **JANET NEWCOMB**, an individual; **JERRY MASON**, an individual; and **METRO MULTIFAMILY HOUSING ASSOCIATION**, an Oregon nonprofit organization, dba, **MULTIFAMILY NW**, <br><br>                 Plaintiffs, <br><br> v. <br><br> **CITY OF PORTLAND**, an Oregon municipal corporation, <br>                 Defendant. | Case No.: 3:20-cv-00294 <br><br> **PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION, AND MEMORANDUM IN SUPPORT** <br><br> **Oral Argument Requested** <br><br> **Expedited Consideration Requested** |

**TABLE OF CONTENTS**

Page

MOTION..........................................................................................................................1

MEMORANDUM IN SUPPORT......................................................................................1

I.    Introduction........................................................................................................1

II.   Factual background............................................................................................2

   A.  The plaintiffs......................................................................................2

   B.  The Ordinances..................................................................................2

      1.  The Screening Ordinance........................................................3

      2.  The Security Deposit Ordinance...............................................4

III.  Standard for Temporary Restraining Order.........................................................4

IV.  Plaintiffs are likely to succeed on the merits........................................................5

   A.  The Ordinances violate the Free Speech Protections of the Oregon and United States Constitutions because they are Content-Based............................5

      1.  Oregon Constitution...............................................................5

      2.  United States Constitution.......................................................7

      3.  The Ordinances restrict and compel speech based on content.......7

   B.  The Ordinances violate Due Process Rights.........................................12

      1.  The Ordinances violate the United States and Oregon Constitutions because they are vague......................................12

      2.  The Ordinances are unconstitutional because they allow uncontrolled discretion, allow unlawful delegation, and provide no fair warning................................................................14

         a.  "Processing" is not defined...........................................14

         b.  "Order of receipt" is not explained.................................14

         c.  It is unclear if "first in time" is required..........................15

         d.  "Reasonable verification" is not defined..........................15

     e.    "Prequalify" is not defined..............................................................................16

     f.    It is unclear if landlords must conduct individual assessments and appeals when denials are based on the unit no longer being available....................................16

     g.    "Termination Date" is not clearly defined. ............................................16

     h.    "Third-party validation" is not defined...................................................17

   3.    Certain provisions of the Ordinances violate Plaintiffs' Substantive Due Process Rights because the provisions are unreasonable and lack a substantial relation to a legitimate governmental purpose. ...............................................................................18

     a.    72-Hour Black Out Period. ......................................................................19

     b.    8-Hour Penalty for Early Application......................................................19

     c.    Prohibition on Requiring Valid Governmental ID....................................20

     d.    Limitation on Security Deposit Use..........................................................20

 C.    The Ordinances are preempted by the Oregon Landlord Tenant Act, ORS Chapter 90. . 21

   1.    The City's policy of disfavoring landlords conflicts with the State's policy of "striking a fair balance between the rights of landlords and tenants."................................21

V.   Plaintiffs will suffer irreparable harm in the absence of preliminary relief.........................29

VI.  The balance of equities tips in plaintiffs' favor and an injunction is in the public interest. . 31

VII.  The Court should require no (or minimal) security under Fed. R. Civ. P. 65(c). .............32

VIII.  Conclusion. ..................................................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Morrow*,
    371 F.3d 1027 (9th Cir. 2004) ...................................................... 13

*Armendariz v. Penman*,
    75 F.3d 1311 (9th Cir. 1996) ....................................................... 18

*Ashland Drilling Inc. v. Jackson Cnty.*,
    168 Or. App. 624, 4 P.3d 748 (2000)......................................... 21, 29

*Bank of Oregon v. Indep. News, Inc.*,
    298 Or. 434, 693 P.2d 35 (1985) ..................................................... 6

*Bloom v. City of San Diego*,
    2018 WL 9539239, at *6 (S.D. Cal. Aug. 21, 2018) ..................... 30

*Brown v. Entm't Merchants Ass'n*,
    564 U.S. 786, 131 S. Ct. 2729, 180 L. Ed. 2d 708 (2011).............. 10

*City of Hillsboro v. Purcell*,
    87 Or. App. 649, 743 P.2d 1119 (1987),
    *aff'd*, 306 Or. 547 (1988) ...................................................... 6, 10

*City of La Grande v. Pub. Emps. Ret. Bd.*,
    281 Or. 137, 576 P.2d 1204 (1978) .......................................... 21, 29

*Complete Angler, LLC v. City of Clearwater, Fla.*,
    607 F. Supp. 2d 1326 (M.D. Fla. 2009)........................................ 32

*Crown Point Dev., Inc. v. City of Sun Valley*,
    506 F.3d 851 (9th Cir. 2007) ........................................................ 18

*Cuviello v. City of Vallejo*,
    944 F.3d 816 (9th Cir. 2019) ........................................................ 29

*Diaz v. Brewer*,
    656 F.3d 1008 (9th Cir. 2011) ...................................................... 32

*Elrod v. Burns*,
    427 U.S. 347, 96 S. Ct. 2673, 49 L.Ed.2d 547 (1976).................... 29

*F.C.C. v. Fox Television Stations, Inc.*,
    567 U.S. 239, 132 S. Ct. 2307, 183 L. Ed. 2d 234 (2012)............. 12

*Farris v. Seabrook*,
    677 F.3d 858 (9th Cir. 2012) .......................................................... 4

*Grayned v. City of Rockford*,
    408 U.S. 104, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972).................. 13

*Greene v. Hren*,
    224 Or. App. 223, 197 P.3d 1118 (2008)....................................... 22

*Herrera v. Santa Fe Pub. Sch.*,
792 F. Supp. 2d 1174 (D.N.M. 2011) ............................................................ 31

*Jorgensen v. Cassiday*,
320 F.3d 906 (9th Cir. 2003) .......................................................................... 32

*Klein v. City of San Clemente*,
584 F.3d 1196 (9th Cir. 2009) ....................................................................... 29

*Lingle v. Chevron U.S.A., Inc.*,
544 U.S. 528, 125 S. Ct. 2074, 161 L. ed. 2d 876 (2005) .............................. 18

*Masonry Bldg. Owners of Oregon v. Wheeler*,
394 F. Supp. 3d 1279 (D. Or. 2019) .......................................................... 5, 10

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) .................................................................... 29, 31

*Napolski v. Champney*,
295 Or. 408, 667 P.2d 1013 (1983) .......................................................... 21, 27

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
585 U.S. __, 138 S. Ct. 2361, 2371, 201 L. Ed. 2d 835 (2018) ...................... 7

*Outdoor Media Dimensions, Inc. v. Dep't of Transp.*,
340 Or. 275, 132 P.3d 5 (2006) ...................................................................... 6

*Pacific Nw. Bell v. Multnomah Cnty.*,
68 Or. App. 375, 681 P.2d 797 (1984) ........................................................... 29

*Reed v. Town of Gilbert*,
576 U.S. __, 135 S. Ct. 2218, 2226, 19 L. Ed. 2d 236 (2015) ........................ 7

*Riley v. Nat'l Fed'n of Blind of N.C., Inc.*,
487 U.S. 781, 108 S. Ct. 2667, 101 L. Ed. 2d 669 (1988) ............................... 7

*Rodriguez v. City of Los Angeles*,
2013 WL 12129651, at *5 (C.D. Cal. Mar. 6, 2013) ...................................... 30

*Roseburg v. Roseburg City Firefighters*,
292 Or. 266, 639 P.2d 90 (1981) ................................................................... 29

*Shanks v. Dressel*,
540 F.3d 1082 (9th Cir. 2008) ....................................................................... 18

*Sinaloa Lake Owners Ass'n v. City of Simi Valley*,
882 F.3d 1398 (9th Cir. 1989) ....................................................................... 18

*Slayter v. Pasley*,
199 Or 616, 264 P2d 444 (1953) .................................................................... 26

*State ex rel. Haley v. City of Troutdale*,
281 Or. 203, 576 P.2d 1238 (1978) ............................................................... 27

*State v. Graves*,
299 Or. 189, 700 P.2d 244 (1985) ................................................................. 14

*State v. Illig-Renn*,
    341 Or. 228, 142 P.3d 62 (2006) .................................................................. 14

*State v. Krueger*,
    208 Or. App. 166, 144 P.3d 1007 (2006)...................................................... 14

*State v. Plowman*,
    314 Or. 157, 838 P.2d 558 (1992) ............................................................ 5, 6

*State v. Robertson*,
    293 Or. 402, 649 P.2d 569 (1982) ........................................................ 5, 6, 9

*State v. Stoneman*,
    323 Or. 536, 920 P.2d 535 (1996) ................................................................ 6

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001) ........................................................................ 4

*Thunderbird Mobile Club, LLC v. City of Wilsonville*,
    234 Or. App. 457, 228 P.3d 650 (2010)........................................................ 27

*Turner Broad. Sys., Inc. v. F.C.C.*,
    512 U.S. 622, 114 S Ct. 2445, 129 L. Ed. 2d 497 (1994)................................ 7

*Wal-Mart Stores, Inc. v. City of Turlock*,
    483 F. Supp. 2d 987, 1021 (E.D. Cal. 2006)................................................. 13

*Wooley v. Maynard*,
    430 U.S. 705, 97 S. Ct. 1428, 51 L. Ed. 2d 752 (1977)................................. 7

**Constitutional Provisions**

Oregon Const., Article I, section 8 .................................................................. 5

U.S. Const. Amend. I.......................................................................................... 7

U.S. Const., Amend. XIV, § 1 ........................................................................ 12

**Statutes**

ORS 90.100................................................................................................... 24

ORS 90.115................................................................................................... 21

ORS 90.130................................................................................... 15, 22, 27

ORS 90.255............................................................................................... 26, 28

ORS 90.297................................................................................................... 25

ORS 90.300............................................................................................. passim

ORS 90.303....................................................................................... 22, 23, 31

ORS 90.304....................................................................................... 23, 28, 30

**Rules**

Fed. R. Civ. P. 65 ................................................................................................... 1, 32

**Other Authorities**

Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/process (accessed Feb. 16, 2020) ............................................... 14

Portland City Code Section 30.01.086 (Ordinance 189580) ................................................. passim

Portland City Code Section 30.01.087 (Ordinance 189581) ................................................. passim

**MOTION**

Pursuant to Fed. R. Civ. P. 65, plaintiffs Janet Newcomb, Jerry Mason, and Metro Multifamily Housing Association, dba, Multifamily NW, move the Court for a temporary restraining order and injunction against defendant City of Portland, enjoining it from implementing and making effective Portland City Code Section 30.01.086 (Ordinance 189580) and Portland City Code Section 30.01.087 (Ordinance 189581). This motion is supported by the memorandum in support and the declarations of plaintiffs and Jill Gibson and exhibits, filed herewith, as well as the complaint filed in this action.

**MEMORANDUM IN SUPPORT**

**I.      Introduction.**

Plaintiffs are Portland landlords who own and manage rental units throughout the City of Portland. They, collectively, own and rent out all types of housing: government assisted housing; workforce housing; and high-end houses and apartments. Plaintiffs take great pride in providing clean, safe, quality rentals in a non-discriminatory manner to families and individuals who cannot afford to be homeowners or who choose to rent. On June 19, 2019, the City of Portland passed housing laws that even the City admits are "complex" and "do not exist anywhere else in the country."[1] Plaintiffs are suing the City because these complex, experimental laws make management of rental housing so costly, burdensome, and risky that plaintiffs will have to either raise rents – to cover the additional costs and risks – or sell their rentals. Plaintiffs are also suing the City because the new laws violate plaintiffs' civil rights of free speech and due process. Finally, plaintiffs are already regulated by federal and state law, which preempts the City's conflicting new laws. The City's additional layer of unreasonable,

---

[1] City of Portland website for Commissioner Chloe Eudaly, https://www.portlandoregon.gov/eudaly/article/727840, last visited Feb. 19, 2020.

unconstitutional governmental regulations will drive out landlords, which will result in reducing the supply of rental units and increasing rents in Portland.

## II.    Factual background.

### A.    The plaintiffs.

Plaintiff Janet Newcomb ("Plaintiff Newcomb") owns and personally manages 19 rental units within the City of Portland.  (Newcomb Decl. ¶ 2.)  She has been a landlord for over 40 years and takes great pride in creating wonderful homes for her tenants.  (*Id.*)  Plaintiff Jerry Mason ("Plaintiff Mason") owns and manages 62 rental units within the City of Portland. (Mason Decl. ¶ 3.)  Plaintiff Metro Multifamily Housing Association is an Oregon nonprofit organization, doing business as Multifamily NW ("Plaintiff Multifamily NW").  It was founded in 1992 to represent residential property managers throughout Oregon and southern Washington state.  Multifamily NW is committed to promoting a high degree of professionalism for rental housing providers and sponsors educational courses and provides compliance services to its members to assist in their efforts to comply with state and federal requirements.  (Deborah Imse Decl. ¶ 2.)

### B.    The Ordinances.

On June 19, 2019, the Portland City Council passed Portland City Code Section 30.01.086 by Ordinance 189580 (the "Screening Ordinance") and passed Portland City Code Section 30.01.087 by 189581 (the "Security Deposit Ordinance"), collectively "the Ordinances."[2]  These Ordinances go into effect on March 1, 2020.

---

[2] For the Court's convenience, the Ordinances are attached as Exhibits C and D to the Declaration of Jill Gibson in Support of Plaintiffs' Motion for Temporary Restraining Order and Order to Show Cause ("Gibson Decl.").

## 1. The Screening Ordinance.

The Screening Ordinance is 13 pages and quoting all the challenged provisions in full is not practicable for this page-limited pleading. The provisions challenged in this action include, but are not limited to, those that:

a. Require landlords to publish notice 72 hours prior to processing applications;

b. Prohibit landlords from processing applications for 72 hours after publishing notice;

c. Require landlords to process applications in specific order of receipt;

d. Require landlords to penalize early applications by 8 hours after the 72-hour black out period is over;

e. Require landlords to accept expired and non-governmental identification of applicants;

f. Prohibit landlords from requiring income in an amount more than 2 or 2.5 times the monthly rent;

g. Require landlords to screen applicants pursuant to either a "low barrier" or "individual assessment";

h. Prohibit landlords from considering certain criminal history, credit history, and rental history in "low barrier" screening;

i. Require landlords to offer appeals for 30 days to all denied applicants and rent to any applicant with a granted appeal at any of landlord's other properties, regardless of whether the applicant financially qualifies;

j. Require landlords to send multiple forms and City-written notices to applicants with strict deadline;

k.  Prohibit landlords from screening "non-applicant tenant" for financial

   responsibility;

l.  Require landlords to house those "non-applicant tenants" without putting them on

   the rental agreement with any financial requirements; and

m.  Require landlords to pay $250 per violation of the Ordinance, plus attorney fees

   and costs if sued for "any" violation.

### 2.    The Security Deposit Ordinance.

The Security Deposit Ordinance provisions challenged in this action include those that:

a.  Require landlords to make repairs within 30 days in order to use security deposit;

b.  Require landlords to attach a list of every item in the unit, with the item's

   calculated depreciated value, in order to use security deposit to repair the item;

c.  Require disputes to be resolved in tenant's favor;

d.  Require landlords to send multiple forms and City-written notices to tenants with

   strict deadlines; and

e.  Require landlords to pay double the amount of the security deposit, plus attorney

   fees and costs if sued for "any" violation.

## III.    Standard for Temporary Restraining Order.

The standard for obtaining a temporary restraining order is "substantially identical" to

that of a preliminary injunction. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co*., 240 F.3d 832,

839 n.7 (9th Cir. 2001). The plaintiff must show that: "(1) she is likely to succeed on the merits,

(2) she is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of

equities tips in her favor, and (4) an injunction is in the public interest." *Farris v. Seabrook*, 677

F.3d 858, 864 (9th Cir. 2012). Alternatively, "'serious questions going to the merits' and a

balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary

injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.*

"[I]n the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction." *Masonry Bldg. Owners of Oregon v. Wheeler*, 394 F. Supp. 3d 1279, 1294 (D. Or. 2019) (citations omitted).

## IV. Plaintiffs are likely to succeed on the merits.

### A. The Ordinances violate the Free Speech Protections of the Oregon and United States Constitutions because they are Content-Based.

#### 1. Oregon Constitution.

The Oregon and United States Constitutions both guarantee freedom of speech. Oregon's constitutional right of free expression is stronger than the federal right; in fact, it may be the most protective in the nation. Article I, section 8, of the Oregon Constitution states:

> No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right.

In *State v. Robertson*, 293 Or. 402, 649 P.2d 569 (1982), the Oregon Supreme Court established a framework for evaluating whether a law violates Article I, section 8. *State v. Plowman*, 314 Or. 157, 163–64, 838 P.2d 558, 562 (1992). In general, the framework consists of three categories into which a challenged provision is grouped and analyzed for constitutional defects. The first category includes ordinances that focus on the content of communication (e.g., opinion, subject-matter), rather than on the effects of the speech. *Id.* at 164; *Robertson*, 293 Or. at 412. If a law focuses on content, then it is unconstitutional unless the scope of the restraint is "wholly confined" within some well-

established and demonstrable exception that existed when the right to free expression was adopted. *Plowman,* 314 Or. at 164.

The second category includes ordinances that focus on forbidden effects, but that expressly prohibit expression used to achieve those effects. *Id.* "Such laws are analyzed for overbreadth," *id.*, which means the ordinance prohibits a mix of speech that is protected by the constitution and speech that can be legislatively punished. *Outdoor Media Dimensions, Inc. v. Dep't of Transp.*, 340 Or. 275, 300, 132 P.3d 5, 19 (2006). If the ordinance is overbroad, then the court examines the statute to determine whether a "narrowing construction" of the statute is possible, or whether the "needed narrowing cannot be accomplished by judicial interpretation," and the legislature instead must undertake it." *Id.* (internal citations omitted).

The third category includes laws that focus on forbidden effects, but without referring to expression at all. *Id.* This category typically includes as-applied challenges to ordinances. *Id.* (citing *Robertson*, 293 Or. at 417).

The Oregon Constitution protects all forms of expression equally. *Bank of Oregon v. Indep. News, Inc.*, 298 Or. 434, 439–40, 693 P.2d 35 (1985). The Oregon Constitution "does not permit commercial and noncommercial speech to be regulated differently on the basis of content." *City of Hillsboro v. Purcell*, 87 Or. App. 649, 653, 743 P.2d 1119 (1987), *aff'd*, 306 Or. 547 (1988). The free speech guarantee under the Oregon Constitution is extremely broad. It extends not only to written and spoken communications, but also to nonverbal expressions. *State v. Stoneman*, 323 Or. 536, 541, 920 P.2d 535 (1996).

### 2.  United States Constitution.

The First Amendment of the United States Constitution, which applies to states through the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. CONST. AMEND. I.  The First Amendment protects both "the right to speak freely, and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714, 97 S. Ct. 1428, 51 L. Ed. 2d 752 (1977).

Under federal free speech analysis, laws that target speech based on its content "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."  *Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. __, 138 S. Ct. 2361, 2371, 201 L. Ed. 2d 835 (2018) ("*NIFLA*") (quoting *Reed v. Town of Gilbert*, 576 U.S. __, 135 S. Ct. 2218, 2226, 19 L. Ed. 2d 236 (2015)).  "Laws that compel speakers to utter or distribute speech bearing a particular message are subject to the same rigorous scrutiny."  *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642, 114 S Ct. 2445, 2459, 129 L. Ed. 2d 497 (1994). As recognized in *NIFLA*, "compelling individuals to speak a particular message" is a content-based regulation because it "alters the content of their speech."  *NIFLA*, 138 S. Ct. at 2371 (quoting *Riley v. Nat'l Fed'n of Blind of N.C., Inc*., 487 U.S. 781, 795, 108 S. Ct. 2667, 101 L. Ed. 2d 669 (1988) (alterations omitted)).  Thus, a regulation that compels a disclosure is a content-based regulation of speech, subject to heightened scrutiny, unless an exception applies.  *NIFLA*, 138 S. Ct. at 2371.

### 3.  The Ordinances restrict and compel speech based on content.

The following provisions regulate plaintiffs' speech based on the content of the speech:

- PCC 30.01.086.C.1.a restricts speech by imposing a 72-hour blackout period during which plaintiffs may not "process" applications.  Landlords "process" applications by

holding open houses, talking to potential applicants, and answering questions about their properties.  (*See* Newcomb Decl. ¶ 11 and Mason Decl. ¶ 17.)  The 72-hour blackout period prohibits this communication about available rentals; at the very least it chills speech because plaintiffs do not want to violate this restriction for fear of being subject to the Screening Ordinance's harsh damages provision.  (*See* Newcomb Decl. ¶ 11 and Mason Decl. ¶¶ 8, 14.)

- PCC 30.01.086.C.1.a(1)-(3) compels speech by requiring landlords' advertisement to include specific information.

- PCC 30.01.086.C.2.a.(1) compels speech by requiring landlords to "digitally or manually record the date and time the Landlord received each completed application."  PCC 30.01.086.C.2.a.(2) then compels *false* speech by requiring landlords to write factually incorrect information on early applications.

- PCC 30.010.086.C.3 compels speech by requiring landlords to provide certain forms (two of which are City-written notices) to applicants along with the application.  The forced communications include:

  o A City of Portland Notice to Applicants relating to a Tenant's right to request a Modification or Accommodation; and

  o A City of Portland Notice to Applicants referencing where an Applicant can obtain the Portland Housing Bureau (PHB)'s Statement of Applicant Rights.

- PCC 30.01.087.E compels speech by requiring landlords to deliver a "Notice of Rights" to tenants regarding security deposits and the right to damages if a landlord fails to comply with the strict requirements of the Ordinance.  This requirement may be met by delivering a copy of the Ordinance to a tenant along with "contact

information for the nearest Legal Aid Services of Oregon, or online and physical address of the Oregon State Bar." *Id.* Information regarding the availability of damages against landlords and the contact information for attorneys who could represent the tenant against the landlord is not the type of communication plaintiffs would choose to have. (Mason Decl. ¶ 12.)

- PCC 30.01.087.F compels speech by requiring landlords, within "5 business days" of receiving a request from tenant, or delivering a Termination Notice, to "provide a written accounting to the Tenant of the Tenant's Rent payment history that covers up to the prior 2 years of tenancy, as well as a fully completed Rental History Form available on the Portland Housing Bureau website." The Rental History Form written by the City mandates very limited disclosures and prevents landlords from communicating any negative information about a tenant. (Imse Decl. ¶ 20.)

The above-described provisions focus on subject-matter and not effects; therefore, they fall into the first category of communications: content-based. *Robertson*, 293 Or. at 412. For example, the 72-hour blackout period entirely restricts, or at least chills, landlord communications with potential applicants regarding available rental units. (Imse Decl. ¶ 17.) The City forces landlords to write certain information on applications, even false information. And the City-written messages that landlords are required to send to applicants and tenants are all content-based. These content-based speech restrictions and requirements are unconstitutional under the Oregon Constitution unless they fit within a historical exception. "Examples [of historical exceptions] are perjury, solicitation or verbal assistance in crime, some forms of theft, forgery and fraud and their contemporary variants." *Id.* Because communicating about rentals or tenants does not fall into a historical exception, the Ordinances are unconstitutional.

Free speech analysis under the First Amendment also starts with a determination of whether a speech regulation is content-based. The Ordinances are content-based under federal analysis because they only regulate landlords' speech and require landlords to deliver a particular message, and prohibit communication about a certain subject: available rentals. *See Masonry Bldg. Owners of Oregon*, 394 F. Supp.3d at 1296-97 ("there can be no debate that the Ordinance is content-based because it regulates only [] building owners' speech" and requires building owners to "speak a particular government-drafted message").[3]

Because the Ordinances are content-based regulations of plaintiffs' speech, they are invalid unless the City can survive strict scrutiny. *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 799, 131 S. Ct. 2729, 180 L. Ed. 2d 708 (2011). To survive strict scrutiny, the Ordinances' speech restrictions and requirements must be narrowly drawn to serve a compelling government interest. *Id.* The government must identify an actual problem that is in need of solving, and the compelled speech must be necessary to the solution.

The City will likely argue that the Ordinances are intended to prevent implicit bias in screening applicants, and plaintiffs agree that is a compelling government interest. However, the Ordinances' content-based speech restrictions and requirements do nothing to advance this goal and the Ordinances are not narrowly tailored. During the 72-hour blackout period, plaintiffs will be prevented from speaking to all applicants, regardless of their status in a protected class. Common sense dictates that applications are submitted after an applicant has had an opportunity to speak to the landlord and take a tour of the property, and under the Screening Ordinance, these

---

[3] It is unnecessary to conduct federal "commercial speech analysis" because plaintiffs are also proceeding under the Oregon Constitution, which treats commercial speech and non-commercial speech the same. *City of Hillsboro v. Purcell*, 87 Or. App. 649, 653, 743 P.2d 1119 (1987), *aff'd*, 306 Or. 547 (1988).

activities may not happen until after the black out period. Protected persons and non-protected

persons will have to wait until the black out period is over before knowing if they even want to

submit an application. Furthermore, no potential applicant will be able to start preparing their

application because there is no requirement that landlords provide the application during the 72-

hour black out period. As Mayor Wheeler observed during the Council Meeting before the

Ordinances were enacted: )

> There is no requirement that the landlord make the app available.
> . . . Why would a landlord send out the application in advance
> knowing that that exposes them not only to administrative burden
> and having to time stamp, sort, first in line, moving it to 8 hours
> back, but it also potentially opens them to legal exposure?

eGov PDX, *Portland City Council Sessions*, June 12, 2019 Wednesday AM Session at 1:54,

YouTube (June 12, 2019)

https://www.youtube.com/watch?v=ztrAEdDa_BI&list=PL4m94lCOY10kcH-

ufAjNIh1ntElCElA4_&index=91. The 72-hour black out period is not only a bad idea, but it

also is not "necessary" to ending implicit bias and does nothing to advance that goal.

Requiring plaintiffs to falsely record the time early applications are received during the

black out period also does nothing to advance the City's goal and is not narrowly tailored.

Again, this arbitrary penalty will apply to protected and non-protected persons alike. For

example, if an Open Application Period starts at 9:00 a.m., and a protected single mom slips her

application under a landlord's door at 7:00 a.m. on her way to work, she will be penalized and

could lose the opportunity to rent the unit. This penalty is not only unnecessary to ending

implicit bias, but will likely have a disparate impact on persons who have disabilities and persons

who have less flexibility in their work schedule or daily routine.

The Ordinances' requirements to speak the City's messages are also not narrowly drawn.[4] The notice regarding the right to request a modification or accommodation, required under PCC 30.01.086(C)(3)(B), is four pages long.  (Gibson Decl. ¶ 4, Ex. C at 6-9.)  The notice regarding applicant rights, required under PCC 30.01.086(C)(3)(c), is three pages long and includes language that favors tenants, such as "Applicants are strongly encouraged to submit supplemental information to offset any reason that could lead to a denial" and "Applicants are strongly encouraged to review their rights before submitting an application."  (Gibson Decl. ¶ 4, Ex. C at 10-12.)  PCC 30.01.087(E) goes as far as stating that landlords may comply with the requirement to provide notice regarding tenants' right to damages by giving tenants the contact information to the nearest Legal Aid Services of Oregon State Bar, presumably so the tenant can more easily sue the landlord.  Requiring plaintiffs to provide tenants information about how to locate an attorney to sue them is not narrowly tailored and not necessary to reduce implicit bias.

### B.     The Ordinances violate Due Process Rights.

#### 1.     The Ordinances violate the United States and Oregon Constitutions because they are vague.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits local governments from "depriv[ing] any person of life, liberty, or property, without due process of law."  U.S. CONST., AMEND. XIV, § 1.  Among other protections, the Due Process Clause demands that "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *F.C.C. v. Fox Television Stations, Inc*., 567 U.S. 239, 253, 132 S. Ct. 2307, 2317, 183 L. Ed. 2d 234 (2012) (citations omitted).  "Vague laws may trap the innocent by not providing fair warning."  *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.

---

[4] The City-written notices are attached to the Gibson Decl. as Exhibits C and D.

Ct. 2294, 33 L. Ed. 2d 222 (1972).  An enactment "is void for vagueness if its prohibitions are not clearly defined." *Id*.

The vagueness doctrine under the United States Constitution has two related requirements.  First, laws must give a person of ordinary intelligence "a reasonable opportunity to know what is prohibited, so that he may act accordingly."  *Grayned*, 408 U.S. at 108.  The court must look "at the very words of the statute in question to determine whether the statutory language is sufficiently precise to provide comprehensible notice of the prohibited conduct." *Anderson v. Morrow*, 371 F.3d 1027, 1031–32 (9th Cir. 2004) (internal quotation omitted).  Second, there can be no "arbitrary and discriminatory enforcement;" laws must "provide explicit standards for those who apply them."  *Grayned*, 408 U.S. at 108.  "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application."  *Id*. at 108-09.  "If a statute is not sufficiently clear to provide guidance to citizens concerning how they can avoid violating it and to provide authorities with principles governing enforcement, the statute is invalid."  *Wal-Mart Stores, Inc. v. City of Turlock*, 483 F. Supp. 2d 987, 1021 (E.D. Cal. 2006).

In addition to the federal Due Process Clause, Article I, sections 20 and 21, of the Oregon Constitution also require that laws be sufficiently clear.  Oregon courts recognize three different ways that a law may be unconstitutionally vague:

> First, a statute may be so vaguely crafted as to permit arbitrary or unequal application and uncontrolled discretion, in violation of Article I, sections 20 and 21, of the Oregon Constitution.  Second, a statute may create an "unlawful delegation issue" under the Due Process Clause of the Fourteenth Amendment in that it contains no identifiable standards or employs standards that rely on the "shifting and subjective judgments of the persons who are charged with enforcing it."  Third, a statute may be so poorly written as to

> fail to provide "fair warning" of the conduct that it prohibits, in
> violation of the Due Process Clause.

*State v. Krueger*, 208 Or. App. 166, 170–71, 144 P.3d 1007 (2006) (citation omitted). Thus, laws are unconstitutionally vague if they allow uncontrolled discretion, allow unlawful delegation, or provide no fair warning. *See, e.g., State v. Graves*, 299 Or. 189, 195, 700 P.2d 244 (1985) (a statute "must not be so vague as to permit a judge or jury to exercise uncontrolled discretion"); *State v. Illig-Renn*, 341 Or. 228, 241, 142 P.3d 62 (2006) (the terms of a law "must be sufficiently explicit to inform those subject to it of what conduct on their part will render them liable to its penalties" (quoting *Graves*, 299 at 195)).

**2.      The Ordinances are unconstitutional because they allow uncontrolled discretion, allow unlawful delegation, and provide no fair warning.**

**a.   "Processing" is not defined.**

The term "process" is not defined in the ordinance, yet landlords will be in violation of the Ordinance if they take any action that is considered by a judge to be "processing" an application during the 72-hour black out period.  PCC 30.01.086(C)(1) and (2).  "Process" is defined by Websters as "to subject to or handle through an established usually routine set of procedures."  Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/process (accessed Feb. 16, 2020).  "Process" is an extremely broad concept and it is unclear if landlords will violate the Ordinance by doing things such as: (1) communicating with a prospective applicant; (2) showing a unit; (3) time stamping and penalizing, as required by the Ordinance, an application that is received early; or (4) putting applications in order of receipt.

**b.   "Order of receipt" is not explained**

PCC 30.01.086(C)(2)(a)(3) does not provide any guidance regarding how to determine the order of receipt for mailed applications.  If a landlord receives 5 applications in the mail the

same day, which one was received first?  When asked about this at a Portland City Council meeting, Commissioner Eudaly, the author of the Ordinances, stated: "I don't know how they would treat applications received in the mail.  That, presumably, would be up to the discretion of the landlord."  eGov PDX, *Portland City Council Sessions*, June 12, 2019 Wednesday AM Session at 2:01.40, YouTube (June 12, 2019),

https://www.youtube.com/watch?v=ztrAEdDa_BI&list=PL4m94lCOY10kcH-ufAjNIh1ntElCElA4_&index=91.  If Commissioner Eudaly does not know how to comply with PCC 30.01.086(C)(2)(a)(1), how can plaintiffs be expected to know?  Moreover, the discretion she mentions does not exist in the Ordinance.  While state law uses words like "reasonable" and "good faith," the Ordinance imposes strict liability for "any" violation.  ORS 90.130; ORS 90.300(7)(a); PCC 30.01.086(H).

### c.  It is unclear if "first in time" is required.

PCC 30.01.086(C)(2)(a)(3) states that the landlord "must accept, conditionally accept, or deny Applicants in order of receipt."  A Screening Criteria Worksheet for Individual Assessments, produced by Commissioner Eudaly, states that landlords must issue a Notice of Denial "before approving or denying another applicant."  (Gibson Decl. ¶ 3, Ex. B at 5 (Step 4, Denial Column).)  It is unclear if landlords may deny a qualified applicant or are required to accept the first applicant who fits their screening criteria.

### d.  "Reasonable verification" is not defined.

PCC 30.01.086(D)(1) lists six types of acceptable applicant identification, including non-governmental identification and expired governmental ID.  The section then adds a catch-all for anything that "would permit a reasonable verification of identity."  It is unclear to landlords what is "reasonable" in this context.  While it may seem reasonable to an applicant to use, for example, their Costco card, this may not be reasonable for a landlord.  Because of the

Ordinance's lack of clarity, landlords will have to guess at what is meant by "reasonable" and will be subject to legal liability if they guess incorrectly.

### e. "Prequalify" is not defined.

PCC 30.01.086(D)(8)(b) requires a landlord to "Prequalify the Applicant for rental opportunities at the Landlord's properties for the 3 months following the date a Landlord approves an application reviewed on appeal," but the term "prequalify" is not defined. It is unclear if this means landlords must approve that applicant for *all* of their future rentals, even rentals that are more expensive and for which the applicant does not qualify based on income.

### f. It is unclear if landlords must conduct individual assessments and appeals when denials are based on the unit no longer being available.

After a landlord completes its evaluation of an applicant, they "must provide Applicant with a written communication of acceptance, conditional acceptance, or denial and in the case of a conditional acceptance or denial, describe the basis for the decision." PCC 30.01.086(D)(5). Landlords who screen under an individual assessment must include in their "Notice of Denial" the following: "an explanation of the basis for denial and an explanation of the reasons that the Supplemental Evidence did not adequately compensate . . . ." PCC 30.01.086(F)(2)(c). Additionally, all landlords, regardless of screening criteria, must offer applicants an opportunity for appeal for 30 days following a denial. PCC 30.01.086(D)(8). It is unclear whether landlords must conduct appeals and individual assessments for applicants who apply for units that have already been rented. The Screening Ordinance expressly requires these processes without an exception for denials based on rentals no longer being available.

### g. "Termination Date" is not clearly defined.

PCC 30.01.087(D)(1) defines "Termination Date" to mean "termination of the Rental Agreement." This definition is vague and unhelpful when applied in Section (D)(2), which

requires the landlord to conduct a walk-through of the rental unit with the tenant "[w]ithin one week following the Termination Date." The termination date of a rental agreement can become a factual and legal dispute between landlords and tenants, and it can mean any of the following:

- Termination by landlord giving notice;

- Termination by the tenant vacating the property;

- Termination determined by a court; or

- Termination by a sheriff locking a tenant out of the property.

Landlords cannot determine from the text of the Security Deposit Ordinance which date is meant by "termination of the Rental Agreement." Without clarity on what "termination date" means, factfinders may use their own uncontrolled discretion to determine that a landlord chose the wrong "termination date" and award damages and attorney fees to a tenant.

### h. "Third-party validation" is not defined.

PCC 30.01.087(D)(1) states that if a landlord and tenant have a disagreement regarding a Condition Report, the landlord and tenant may "obtain third-party validation." However, there is no guidance regarding what is meant by a "third-party validation," who may serve as the third-party, and who would pay for such validation. It is clear, however, that any unresolved disputes "shall be resolved in favor of the Tenant." *Id*.

In sum, the Ordinances are vague because they do not define key terms and they lack identifiable standards. As a result, juries will be unlawfully delegated the authority to make basic policy decisions regarding whether landlords may speak to applicants during the 72-hour black out period, whether Costco cards provide "reasonable verification" of identity, and whether applicants may "prequalify" for more expensive units. The Ordinances at issue do not provide landlords with fair warning regarding the conduct that will result in a violation. This vagueness

leaves landlords guessing about how to act and fearful of guessing wrong and being liable for damages, double security deposits, and attorney fees. As such, those Ordinances are void for vagueness under the United States Constitution and Oregon Constitution.

### 3. Certain provisions of the Ordinances violate Plaintiffs' Substantive Due Process Rights because the provisions are unreasonable and lack a substantial relation to a legitimate governmental purpose.

To determine whether the Ordinances infringe upon plaintiffs' substantive due process rights, the Court must determine whether the City engaged in an action "that is 'so arbitrary or irrational that it runs afoul of the Due Process Clause.'" *Shanks v. Dressel*, 540 F.3d 1082, 1087 (9th Cir. 2008) (quoting *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 542, 125 S. Ct. 2074, 161 L. ed. 2d 876 (2005)); *Crown Point Dev., Inc. v. City of Sun Valley*, 506 F.3d 851,855 (9th Cir. 2007) (discussing viable substantive due process claims as those that request protection from governmental action that serves no legitimate governmental purpose, or that is arbitrary, unreasonable, and lacking in any substantial relation to the public health, safety, or general welfare); *Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 882 F.3d 1398, 1407 (9th Cir. 1989) ("To establish a violation of substantive due process, the plaintiffs must prove that the government's action was 'clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.'"), *overruled on other grounds*, *Armendariz v. Penman*, 75 F.3d 1311, 1324-26 (9th Cir. 1996).

Plaintiffs recognize that curtailing implicit bias is a legitimate – and laudable – governmental purpose. Plaintiffs pride themselves on voluntarily adopting best practices that protect against implicit bias. However, certain provisions serve no legitimate governmental purpose; they are arbitrary, unreasonable, and lack any substantial relation to curtailing implicit bias in screening and renting apartments.

### a. 72-Hour Black Out Period.

The 72-hour black out period is not substantially related to curtailing implicit bias because it will prevent all applicants from applying for a rental unit. It will prevent plaintiffs from processing applications from protected classes and non-protected classes alike. It will not assist persons who are disabled by giving them additional time to prepare an application because the Screening Ordinance does not require landlords to provide the application at the beginning of the black out period. As such, the black out period just delays the process of renting an apartment for 72 hours, and during that waiting period no prospective applicant may start preparing an application for submission. The black out period is arbitrary, unreasonable, and not substantially related to reducing barriers for protected applicants.

### b. 8-Hour Penalty for Early Application.

Similar to the black out period, the 8-hour penalty for early application will penalize all applicants, not just non-protected persons. As Mayor Wheeler pointed out: "There is a degree to which this is arbitrary. Eight hours was picked . . . you have a stack of applications in the mailbox, you can not time stamp them and you have no legitimate way of knowing which order these came in. . . . It's administratively complicated. It adds an extra burden . . .. and in some cases, that eight hours may cause people to lose that opportunity . . ." eGov PDX, *Portland City Council Sessions*, June 12, 2019 Wednesday AM Session at 1:47.35, YouTube (June 12, 2019), https://www.youtube.com/watch?v=ztrAEdDa_BI&list=PL4m94lCOY10kcH-ufAjNIh1ntElCElA4_&index=91. Because the 8-hour penalty is arbitrary and not substantially related to reducing barriers for protected applicants, it violates plaintiffs' substantive due process rights.

### c. Prohibition on Requiring Valid Governmental ID.

The Screening Ordinance requires landlords to accept expired government-issued ID and non-governmental ID for identification purposes. Landlords are entitled to know the true identity of their tenants, and without such information they will be unable to effectively screen applicants through low barrier or individual assessment. (Mason Decl. ¶ 10; Newcomb Decl. ¶¶ 5, 6.) Landlords also have a duty to their other tenants to protect them from persons who have stolen or have false identification, and prohibiting landlords from being able to require valid government-issued ID will harm landlords and their other tenants. This provision is not only harmful, but also arbitrary because allowing the use of noncredible ID is not substantially related to reducing implicit bias.

### d. Limitation on Security Deposit Use.

The restrictions regarding the use of security deposits make it very difficult for landlords to repair damage caused by tenants. The provisions impose multiple hoops for landlords to jump through, including a 30-day deadline for completion of repairs. These regulatory burdens, and the fear of being sued for damages and attorney fees if the landlord makes any mistake in using security deposits, will likely result in repairs not being made to rental units, and over time this will negatively affect the condition and habitability of rental units in general. These restrictions are not only unnecessarily harsh and punitive, but also arbitrary because there is no substantial relation to using security deposits for repairs and implicit bias in screening applicants. By the time a security deposit could be used, the rental process is complete and the possibility of implicit bias in screening is past. The City did not base these Ordinances on any information or studies that show landlords discriminate when using security deposits to make repairs; thus, there is no substantial relationship to the goals of the Ordinances.

### C. The Ordinances are preempted by the Oregon Landlord Tenant Act, ORS Chapter 90.

"When a local enactment is found incompatible with a state law in an area of substantive policy, the state law will displace the local rule." *City of La Grande v. Pub. Emps. Ret. Bd.*, 281 Or. 137, 149, 576 P.2d 1204 (1978). Based on *La Grande* and its progeny, courts engage in a two-step process to determine whether state law preempts a local ordinance. The first step is determining whether "the legislature meant it law to be exclusive." *Id*. at 148. A legislative intent to preempt local regulation "is apparent if it is expressly or otherwise clearly manifested in the language of the statute." *Ashland Drilling Inc. v. Jackson Cnty.*, 168 Or. App. 624, 634, 4 P.3d 748 (2000). If a court finds no evidence of express preemption, the second step of the inquiry is examining the city ordinance to determine whether the ordinance conflicts with state law. *La Grande/Astoria*, 281 Or. at 148. An examination of the Ordinances shows that they conflict with state law in numerous ways.

#### 1. The City's policy of disfavoring landlords conflicts with the State's policy of "striking a fair balance between the rights of landlords and tenants."

The Oregon Legislature passed SB 159 in 1972, which is known as the Oregon Residential Landlord Tenant Act ("ORLTA"), now codified in ORS Chapter 90. ORTLA "regulates and determines rights, obligations and remedies under a rental agreement, wherever made, for a dwelling unit located within this state." ORS 90.115. ORTLA does not simply set regulations for landlords; rather, it establishes a detailed, comprehensive system of corresponding and reciprocal rights and obligations on landlords and tenants. The legislature took great care to balance the rights of both parties and established a statewide policy of fairness to both. *See Napolski v. Champney*, 295 Or. 408, 667 P.2d 1013, 1020 (1983) (discussing "ORLTA's policy of achieving a fair balance between the rights of tenants and landlords").

In fact, ORLTA expressly provides that, as a prerequisite to the rights and remedies under the act, both landlords and tenants must act in good faith. ORS 90.130. Recognizing the state policy of balance and reciprocal duties of good faith, the Oregon Supreme Court has observed: "We are not at liberty to balance the rights of tenants and landlords when the legislature already has completed the task." *Greene v. Hren*, 224 Or. App. 223, 230, 197 P.3d 1118 (2008). This balancing act – or "task" – is accomplished by ORLTA containing corresponding rights and duties on landlords and tenants. For example, statutes at ORS 90.303 – 323 are entitled "Landlord Rights and Obligations." And ORS 90.360 – 90.390 is entitled "Tenant Rights and Remedies."[5]

The first "landlord right" listed in ORS Chapter 90 is section 303: "Evaluation of applicant." By enacting this statute, the Oregon Legislature has given landlords broad discretion when screening applicants by only prohibiting certain screening factors. For example, ORS 90.303(1)(b) states that landlords may not consider forcible entry and wrongful detainer judgments ("FEDs") that are more than five years old against an applicant. The Screening Ordinance's low barrier process, at PCC 30.01.086(E)(1)(c), directly conflicts with ORS 90.303(1)(b) by prohibiting landlords from considering FED judgments that are more than three years old. As such, state law provides greater rights for landlords to consider FED judgments entered against applicants and the Ordinance attempts to amend this statutory. The Ordinance even goes further and prohibits certain FEDs from being considered at all, even if they were entered against the applicant one week ago. *See* PCC 30.01.086(E)(1)(c)(1)(c) (landlord may not reject applicant based on no cause eviction).

---

[5] Additional "tenant obligations" are found at ORS 90.325 - 340. Additional "landlord remedies" are found at ORS 90.391 – 440.

Additionally, ORS 90.303(3) states that landlords may not consider criminal convictions and charging history "unless" they are for conduct that is a drug-related crime, a person crime, a sex offense, a financial fraud crime, or any other crime that adversely affects the property of the landlord or a tenant or the health, safety, or right to peaceful enjoyment of other residents. These exceptions give landlords the express, affirmative right to consider such criminal history of applicants. For example, state law gives landlords the right to consider whether an applicant has been convicted for sex crimes regardless of when the crime occurred, and this statutory right is very important to some landlords. (*See* Newcomb Decl. ¶ 17.)

The Screening Ordinance's low barrier process, at PCC 30.01.086(E)(1)(a), conflicts with this state statute by prohibiting the consideration of multiple criminal factors, including felonies that are more than seven years old. Therefore, landlords using the low barrier screening process would be prohibited from considering whether an applicant was convicted eight years ago of sex crimes. The Screening Ordinance strips landlords of an explicit right given by ORS 90.303(3).

ORS 90.304 creates additional rights for landlords that are eliminated under the Screening Ordinance. This statute states that a landlord's statement of reasons for denial may include but are not limited to "insufficient rental history," "negative information provided by a consumer credit reporting agency," "and inability to verify information regarding credit history." ORS 90.304(2)(a)(B) and (D), and (c)(B) and (C). The Screening Ordinance's low barrier prohibits denying applicants for these reasons. PCC 30.01.086(E)(1)(b)(2) and (3), and (c)(3). Additionally, the Ordinance's general screening process, which applies to both low barrier screening and individual assessments, prohibits landlords from screening "non-applicant tenants" for financial responsibility. This term appears to be created by the Ordinance, and it means a tenant who will reside in the rental unit but who is not responsible for paying rent.

PCC 30.01.086(D)(3). Under state law, landlords have the right to screen all applicants for financial responsibility, even those who are not responsible for paying rent. *See* ORS 90.100(47) ("tenant" means a person, including a "roomer" who is entitled under a rental agreement to occupy a dwelling unit). The ability to screen all applicants for financial responsibility is critically important to plaintiffs and they rely on their statutory rights to do so. (*See* Newcomb Decl. ¶¶ 7, 8.) The Ordinance strips them of this right.

ORS 90.300 establishes landlords' rights pertaining to security deposits. Under this statute, landlords have broad discretion to use security deposits to pay the reasonable expenses "to remedy the tenant's defaults in the performance of the rental agreement" and to "repair damages to the premises caused by the tenant, not including ordinary wear and tear." ORS 90.300(7). Importantly, the landlord is not required to repair the damage before deducting the cost to make the repair.

The Security Deposit Ordinance, at PCC 30.01.087(C)(1), conflicts with state law by only allowing landlords to use security deposits to repair appliances and fixtures that are individually identified in the rental agreement and depreciated according to a schedule published by the City of Portland. Fixtures, appliances, equipment, or personal property "shall be itemized by description and full replacement value and incorporated into the Rental Agreement." PCC 30.01.087(C)(3). A typical bathroom can contain 50 items that could be damaged by a tenant, including curtain clips, towel bars, light switches, and floor molding. (Imse Decl. ¶ 24.) If a landlord wants to be able to use a security deposit to repair any of these items should they become damaged by a tenant, the landlord will have to list all 50 items and include a depreciated value for each item. (*See* Imse Decl. ¶¶ 23, 24, Exs. D, E.) Calculating the depreciated value will be very time consuming because the landlord will have to determine and record the original

purchase price and original purchase date.  PCC 30.01.087(C)(1) and (3).  Then the landlord will have to look up the item's depreciation schedule on the City's website and determine the number of years the item may be depreciated.  (Imse Decl. ¶ 23.)  Based on all that information, a depreciated value/cost to replace must be calculated.  (*Id.*)  Landlords will have to perform a separate calculation for each item, in each room in the house.  Landlords are unable to assign a different value to a certain item unless the tenant agrees to do.

Furthermore, the Ordinance requires that "actual costs" be incurred before deducting any funds from security deposits, which means landlords will not be able to deduct from a security deposit for a damaged fixture unless the landlord is able to make the repairs immediately.  This means landlords will not be able to collect any funds for partial damage.  These new limitations on the use of security deposits are a huge departure and change from state law, which gives landlords the right to use security deposits to pay for any default and damage, including repair to common areas.

In addition to the rights contained in ORS 90.300, ORS 90.297(2) authorizes landlords to enter into "agreements to execute a rental agreement."  These agreements are used by landlords and tenants as a way to secure the execution of the rental agreement in situations where the tenant is not ready to immediately execute.  The tenant puts down a deposit and if the rental agreement is later executed, the landlord applies the deposit towards the tenant's account or refunds the deposit.  If the rental agreement is not executed due to a failure on the tenant's part, the deposit is forfeited.  These types of agreements are prohibited under the Screening Ordinance because it states that a landlord and applicant "must enter into a Rental Agreement" upon the landlord's approval and the applicant's acceptance.  PCC 30.01.086(C)(2)(e).  Pursuant to this language, the landlord and applicant will be forced into a contract upon the occurrence of these

two events and the Ordinance does not make any exceptions for unforeseen, intervening events that may make executing the rental agreement impractical. The Ordinance dispenses with basic contractual elements, such as "a meeting of the minds" upon the essential elements of the contract. For this reason, these forced contracts may be voidable. *See, e.g., Slayter v. Pasley*, 199 Or 616, 627, 264 P2d 444, 449 (1953) (a contract is not binding unless all the terms and conditions are agreed upon).

The conflicts between state law and the Ordinances are too numerous to mention in this page-limited brief, and the above examples are not exhaustive of the many inconsistencies. Many of the inconsistencies appear insignificant on the surface,[6] but given the harsh damages provided to tenants under the Ordinances, each conflict, regardless of how minor, is very significant to landlords because a landlord that fails to comply with "any" of the Ordinances' requirements "shall be liable to the tenant" for double the amount of the security deposit, attorney fees, costs, and additional damages. As such, if a landlord attempts to charge a tenant for the landlord's own carpet cleaning services, as allowed under state law, a tenant could sue and win under the Ordinance because it prohibits landlords from charging for regular cleaning. *See* ORS 90.300(7)(c) and PCC 30.01.087(C)(4). The damages provisions in the Ordinances impose strict liability on landlords and they are not reciprocal, which conflicts ORLTA's attorney fees provision. *See* ORS 90.255 (prevailing party may receive attorney fees "in any action on a rental agreement").

In addition to these specific and express conflicts, the Ordinances are preempted because they fundamentally change the relationship between landlords and tenants. As discussed above,

---

[6] For example, ORS 90.300(7)(b) authorizes landlords to use security deposits to pay for the landlord's own cleaning work. PCC 30.01.087(C)(4) conflicts with this statute by stating that a security deposit may not pay for cleaning.

ORLTA establishes a balanced, comprehensive set of rights and obligations between landlords and tenants that requires "good faith" and "reasonableness." ORS 90.130; ORS 90.300(7)(a). However, the Ordinances dispense with these concepts and impose a punitive strict liability on landlords for making "any" accounting or clerical error, even if no bad faith exists and no actual damage is suffered by a tenant.

The Oregon Supreme Court has stated that ORTLA established a state policy of striking a fair balance between the rights of landlords and tenants. *Napolski*, 295 Or. at 419 (discussing "ORLTA's policy of achieving a fair balance between the rights of tenants and landlords"). However, the Security Deposit Ordinance dispenses with this state policy of establishing a "fair balance" and imposes a conflicting policy of favoring tenants in rental disputes. PCC 30.01.087(C)(1) states that landlords may provide a depreciation value that is different than the City of Portland's schedule only if it is "reasonably acceptable to a Tenant." Additionally, PCC 30.01.087(D)(1) states that any "unresolved dispute as the condition of the Dwelling Unit as of the Commencement Date shall be resolved in favor of the Tenant." These provisions expressly favor tenants and leave landlords with no rights when condition reports and replacement costs are disputed. The City obviously prefers social objectives that differ from ORLTA, but the City is not at liberty to impose a conflicting substantive social policy and law.

Despite such conflicts, the City will likely argue that it may establish requirements stricter than those established in ORLTA. *See State ex rel. Haley v. City of Troutdale*, 281 Or. 203, 211, 576 P.2d 1238 (1978) (Oregon's "minimum" construction standards did not preempt stricter local construction standards"); *Thunderbird Mobile Club, LLC v. City of Wilsonville*, 234 Or. App. 457, 474, 228 P.3d 650 (2010) (Oregon's requirement regarding relocating mobile home parks did not preempt a stricter local requirement). These cases differ from the case at

hand because they dealt with state *requirements;* and the state laws at issue in the current case pertain to statutory *rights.* The Ordinances are not simply building upon existing state requirements and imposing stricter local requirements that are congruous with and supportive of the state's substantive social policy, as in *Haley* and *Thunderbird.* Instead, the Ordinances are eliminating express rights that were created by the Oregon Legislature and creating wholly new legal obligations and liabilities between third parties. Additionally, the local requirements at issue in *Haley* and *Thunderbird* were enforced by the local government; thus, the local government was able to ensure that the requirements would "be applied in a manner such that the provisions and state law operate concurrently." *Thunderbird*, 234 Or. App. 461.

Conversely, in the case at hand, the City is not enforcing the Ordinances – state judges and juries are. And those factfinders will be in the unenviable position of having to reconcile conflicting state rights and local prohibitions regarding rental screening and security deposits. Moreover, these cases will be complicated by the fact that the Ordinances contain damage provisions that are different than the remedies provided in ORLTA. For example, if a landlord fails to properly return a portion of a security deposit, under state law a tenant may recover twice the amount withheld and a court would have the discretion to award attorney fees. ORS 90.300(16); ORS 90.255. Under the Security Deposit Ordinance, the tenant would recover twice the amount of the entire security deposit, regardless of the amount withheld, and a court would be required to award attorney fees. PCC 30.01.087(G). Additionally, if a landlord improperly notifies a tenant of a denial, under state law the landlord would be liable for $100. ORS 90.304(3). Under the Screening Ordinance, the landlord would be liable for $250 plus attorney fees and costs.

Because the Ordinances do not simply build upon existing state requirements, this Court should follow cases that review a local government's attempt to replace the state's substantive social policy choices with their own. For example, in *Roseburg v. Roseburg City Firefighters*, the Oregon Supreme Court held that the state Public Employee Collective Bargaining Act preempted Roseburg's collective bargaining ordinances because the two systems contained conflicting dispute resolution mechanisms. 292 Or. 266, 279-82, 639 P.2d 90 (1981). "No state law in an area of substantive policy has ever been held subordinate to a contrary local rule," and this Court should enjoin and declare that the Ordinances are preempted by ORLTA. *La Grande/Astoria*, 281 Or. at 149; *see also Ashland Drilling, Inc.,* 168 Or. App. 624; *Pacific Nw. Bell v. Multnomah Cnty.*, 68 Or. App. 375, 681 P.2d 797 (1984).

## V. Plaintiffs will suffer irreparable harm in the absence of preliminary relief.

Regarding plaintiff's constitutional claims, it is well established that the deprivation of constitutional rights "unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L.Ed.2d 547 (1976)). The loss of First Amendment freedoms "for even minimal periods of time, unquestionably constitutes irreparable injury." *Klein v. City of San Clemente*, 584 F.3d 1196, 1207-08 (9th Cir. 2009) (quoting *Elrod*, 427 U.S. 347). ). Additionally, "[a]n ordinance need not be enforced against a speaker to pose a threat to his free speech rights." *Cuviello v. City of Vallejo*, 944 F.3d 816, 832 (9th Cir. 2019). If plaintiffs' speech is impermissibly affected under threat that the Ordinances will be enforced against them, this is a chill on their "free speech rights - even if it results from a threat of enforcement rather than actual enforcement - [and] constitutes irreparable harm." *Id*., at 832-33 (citations omitted). Although the Ninth Circuit does not require a strong showing of irreparable harm for constitutional injuries, *id.* at 833, plaintiffs

have shown that the Ordinances violate their free speech and substantive due process rights, and this results in irreparable harm.

In cases involving unconstitutional vagueness, a "chilling effect that is likely to result from enforcement of an unconstitutional statute constitutes irreparable injury because it forces individuals to choose between exercising their rights on particular occasions or risking prosecution, a wrong which cannot be remedied under law." *Rodriguez v. City of Los Angeles*, 2013 WL 12129651, at *5 (C.D. Cal. Mar. 6, 2013) (citations omitted); *see*, *Bloom v. City of San Diego*, 2018 WL 9539239, at *6 (S.D. Cal. Aug. 21, 2018). As shown by plaintiffs' declarations, there is much uncertainty and confusion regarding how to comply with the Ordinances, to the point where some are contemplating selling their rental units because they fear being sued for substantial damages because they do not know how to comply. This constitutes irreparable harm.

Plaintiffs are also irreparably harmed by the loss of their statutory rights under ORLTA to deny applicants for objective reasons such as "insufficient rental history," "negative information provided by a consumer credit reporting agency," and "inability to verify information regarding credit history." ORS 90.304(2)(a)(B) and (D), and (c)(B) and (C). Under the Ordinances, landlords must conduct burdensome individual assessments in order to deny applicants for these reasons. Plaintiffs will also be irreparably harmed by losing their broad discretion to use security deposits to repair tenant-caused damages. Perhaps most importantly, plaintiffs will lose the right to balanced laws regulating the relationship with their tenants.

**VI. The balance of equities tips in plaintiffs' favor and an injunction is in the public interest.**

The balance of equities tips decidedly in favor of plaintiffs. Plaintiffs face deprivation of their constitutional rights, which far outweighs any harm the City might claim. *See, e.g., Herrera v. Santa Fe Pub. Sch.*, 792 F. Supp. 2d 1174, 1198 (D.N.M. 2011) (threatened injury to plaintiff's constitutional rights outweighed potential injury to defendant from restraining order because "deprivation of a constitutional right is a significant and irreparable injury to the individual holding the right" (internal citation omitted)). The fact that plaintiffs will lose their statutory rights to screen and use security deposits under state law will also weigh in plaintiffs' favor. Under the Ordinances, plaintiffs will be forced to, among other things, enter into rental agreements with applicants who plaintiffs could deny under ORLTA for lack of credible identification or income below 3 times the amount of rent. *Compare* ORS 90.303(2)(c)(A) and (3) *with* PCC 30.01.086(D)(1)(g) and (2).

On the other side of the scale, the City can claim little harm to outweigh these significant injuries. Because the Ordinances regulate private contracts to which the City is not a party, the City will not be deprived of any revenue and will not lose any rights or discretion.

The public interest also favors plaintiffs. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002 (internal quotation and citation omitted). It is also in the public interest to have the City's complex and experimental laws fully vetted by the Court through a summary judgment action prior to these laws taking effect. Once effective, all landlords in Portland will have to attend training and/or consult with attorneys to try to understand their new obligations under the law and change multiple business practices in an attempt to comply. And all renters will similarly have to understand their new rights before applying for and entering into rental agreements. It would be hugely confusing to the public to start

operating under these "complex and first-in-the-nation" laws only to have the laws become void after a summary judgment hearing. Should the City ultimately prevail on the merits, the City will at most have suffered only a delay in making the laws effective.

**VII.    The Court should require no (or minimal) security under Fed. R. Civ. P. 65(c).**

Under Federal Rule of Civil Procedure 65(c), this Court has discretion to determine the proper amount of security for payment of costs and damages that may be incurred by any party who is found to have been wrongfully enjoined or restrained. *Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011). A court "may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (internal citation omitted). In this action, the required security -if any -should be minimal. The City realizes no revenues from the Ordinances and will not suffer any harm as a result of a temporary restraining order. Moreover, plaintiffs here seek, among other things, to vindicate important constitutional rights of free speech and due process. *See, e.g., Complete Angler, LLC v. City of Clearwater, Fla*., 607 F. Supp. 2d 1326, 1335 (M.D. Fla. 2009) ("Waiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right."). Under these circumstances, it is just and equitable for the Court to waive the security requirement or require only minimal security.

**VIII. Conclusion.**

For the reasons set forth above, the Court should temporarily stay the Ordinances and further order the City to show cause why the temporary restraining order should not continue and remain in effect during the pendency of this action.

DATED this 21st day of February, 2020.

LYNCH CONGER LLP

By:   *s/Jill O. Gibson*_____
Jill O. Gibson, OSB #973581
jgibson@lynchconger.com
Benjamin R. Becker, OSB #103358
bbecker@lynchconger.com
Attorneys for Plaintiffs

## CERTIFICATE OF COMPLIANCE WITH L.R. 7-2(b)(2)

I certify that this brief complies with the applicable word-count limitation under L.R. 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 9,546 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of authorities, signature block, and any certificates of counsel.

DATED this 21st day of February, 2020.

*s/Jill O. Gibson*

_____
Jill O. Gibson, OSB #973581
Of Attorneys for Plaintiffs